769 So.2d 438 (2000)
Paula Y. ALBRITTON, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-2008.
District Court of Appeal of Florida, Second District.
September 20, 2000.
*439 James Marion Moorman, Public Defender, and William L. Sharwell, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Wendy Buffington, Assistant Attorney General, Tampa, for Appellee.
DANAHY, PAUL W., Senior Judge.
Paula Albritton appeals her judgment and sentence for abuse of a dead body, a second-degree felony. Ms. Albritton, who was convicted after jury trial, raises several issues on appeal. We conclude that the trial court erred in denying her motion to suppress her confessions. Because we reverse and remand for a new trial on that basis, we find it unnecessary to address Ms. Albritton's remaining claims.
The facts of this case are peculiar and somewhat macabre. Trial testimony showed that in November 1997 a severed human hand was found near a riverbank. Lying next to the hand was a bag containing two clay pots and some decorative rocks. Fingerprints were taken from the hand, and a computer search revealed that the prints were those of a Mr. Willie Sutton. Mr. Sutton had died in June 1997, at which time an autopsy was conducted. After the autopsy, Mr. Sutton's organs were placed in a plastic bag, the bag was placed in his chest cavity, and his breastbone was replaced. The body was released to Green's Funeral Home through a county program for indigent burials. Ms. Albritton was the director of Green's Funeral Home.
After the discovery of Mr. Sutton's hand, his body was exhumed. Mr. Sutton's left hand was missing, and twelve dolls with notes pinned to them were discovered in his chest cavity. On some of the notes were the names of other funeral directors in the area.
At trial, two videotaped police interviews of Ms. Albritton were played to the jury. The first videotaped interview was made on June 26, 1998, and the second videotaped interview was made the next day. In the videotaped interviews, Ms. Albritton explained that she mutilated Mr. Sutton's body as part of a religious ritual called the "helping hand"; this ritual had the intended effect of bringing peace to Mr. Sutton's spirit. Ms. Albritton indicated that Mr. Sutton was a friend. She stated that Mr. Sutton's spirit protected the business because his spirit had nowhere to go. The ritual involving Mr. Sutton's body was also performed with the additional purpose of helping the funeral home. The dolls that were placed in Mr. Sutton's chest cavity each represented a matter that was troubling to Ms. Albritton. On the videotapes, Ms. Albritton indicated that the only other person present during the ritual was her adult son, Jimmy Lee Clark, and that she helped him cut off Mr. Sutton's hand. After the ritual, she and her son placed the hand in a weighted plastic bag and threw the bag into the river. They then said an incantation over the hand. Ms. Albritton explained that the incident was "religious voodoo."
Detective Thomas Petty of the Bradenton Police Department testified at trial and *440 at the hearing on the motion to suppress that after the first videotaped interview, he obtained Ms. Albritton's consent to a search of her house and of the funeral home. During the search of the funeral home, Ms. Albritton identified the scalpel that was used to sever Mr. Sutton's hand.
At trial, Ms. Albritton denied being involved in the mutilation of Mr. Sutton's body and stated that she lied to protect her son who had mental and emotional problems. She stated that there is no such thing as a "helping hand" ritual. She testified that she decided to take the blame for her son when the investigating officer told her that if it were a religious ritual, it would be protected by the Constitution.
Ms. Albritton's son testified that he was on Thorazine and Prolexin and that he had been hearing voices since he was twelve or thirteen. He stated that he cut off Mr. Sutton's hand and placed the dolls in Mr. Sutton's body because the voices told him to do so. He retrieved the names of the other funeral directors from a book in his mother's office and wrote the names on the notes that were placed on the dolls in Mr. Sutton's chest cavity. He further said that his mother had nothing to do with it.
Prior to trial, Ms. Albritton moved to suppress the statements she gave to the police on the ground that they were involuntary. She alleged that her statements were induced by a promise that she would not be subjected to prosecution if the acts that were performed on Mr. Sutton's body were part of a religious ritual. At the hearing on the motion, Detective Petty testified that he and Detective Valerie Shoates went to Ms. Albritton's residence on the afternoon of June 26, 1998, and asked her if she would follow them to the police station to discuss Willie Sutton. Ms. Albritton drove to the station where she was interviewed by the officers. Portions of the videotape of this interview were played at the hearing on the motion to suppress. On the videotape, Detective Petty told Ms. Albritton:
Like I told you earlier, we have an expert coming up from Miami who deals with this type of stuff who's going to explain what we found to us so we know what we're dealing with. Now, if this was a religious activity, religious activity is protected under the Constitution. And if that was all this is, then we'll find that out and we're done. If not ... [this] is a second degree felony punishable up to I think 25 years in prison.[1]
Detective Petty stated to Ms. Albritton that it appeared to him to be a religious ritual. The following exchange then took place:
Q. Paula, that's all I want to know, if this was a religious ceremony that was performed on Mr. Suttle [sic] to help his spirit do whatever it was to do in his religion or your religion or anyone else's religion. That's all I want to know.
A. Yeah, it was religious.
Q. Please explain to meso for my future, if I run into this again, I'll know what I'm looking at.
A. Okay. It was religious, okay?
At the end of the interview, after Ms. Albritton had described the mutilations to Mr. Sutton's body as being part of a religious ritual, Detective Petty informed her that he needed to talk to the State Attorney's Office to see what could be worked out. He stated that "maybe nothing else will be done with this." He then stated that "there is a possibility that charges may come out of this and it may be all to the fact that you basically (unintelligible) hand into the river." After she confessed that her actions were part of a religious ritual and around the same time that she signed the consent-to-search form regarding *441 her house and the funeral home, Ms. Albritton was read her Miranda[2] warnings. Detective Petty testified that he did not Mirandize Ms. Albritton earlier because she was at the station voluntarily. Prior to the police finishing the searches of Ms. Albritton's house and the funeral home, Detective Petty asked her if she would come to the station at a set time the next day. Ms. Albritton agreed, and prior to the second interview which was also recorded on videotape, Detective Petty reminded her of her Miranda rights. Ms. Albritton said she did not need them reread. She then went on to confess to the crime a second time. Ms. Albritton was arrested on June 29. She was interviewed for a third time on that date.
Ms. Albritton testified at the hearing on the motion to suppress. She indicated that only after she was told that the acts in question were protected by the Constitution if they involved religious activity did she decide to confess because she thought that what she was confessing to was legal and she could not be prosecuted. She further indicated that she confessed in order to protect her son, but she would not have done so except for Detective Petty's statements regarding religious rituals being constitutionally protected.
The trial court denied the motion to suppress. The trial court found that "the statement made by the detective to the effect that religious acts are protected by the United States Constitution did not constitute a promise." The trial court noted that Ms. Albritton testified at the hearing that she incriminated herself in order to protect her son. Based on this, the trial court found that Detective Petty's statement did not induce her confession.
To be admissible into evidence at trial, the State must show that a confession was voluntarily given. See DeConingh v. State, 433 So.2d 501, 503 (Fla. 1983). Where the defendant in the trial court challenges the voluntariness of the confession, the burden is on the State to establish by a preponderance of the evidence that it was freely and voluntarily given. See Escobar v. State, 699 So.2d 988, 994 (Fla.1997); DeConingh, 433 So.2d at 502. The trial court's ruling on a motion to suppress is presumptively correct. See Escobar, 699 So.2d at 993-94. However, the ultimate issue of the voluntariness of a confession is a legal question requiring independent review. See Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). For a confession to be voluntary, it cannot be obtained through direct or implied promises. See Johnson v. State, 696 So.2d 326, 329 (Fla. 1997). "A confession obtained as a result of a direct or implied promise of benefit or leniency is involuntary and inadmissible." Wittemen v. State, 735 So.2d 538, 539 (Fla. 2d DCA 1999). "If the interrogator induces the accused to confess by using language which amounts to a threat or promise of benefit, then the confession may be untrustworthy and should be excluded." Fillinger v. State, 349 So.2d 714, 716 (Fla. 2d DCA 1977). In Fillinger, we reversed the trial court's denial of the defendant's motion to suppress, concluding that the evidence showed her confession was induced by promises of leniency where the interrogating officer told her he would take her cooperation into consideration in seeking to establish the amount of bond. We further held that under these circumstances the "state had failed to carry its burden of proof that the confession was freely and voluntarily made." Id. at 716.
In the present case, the trial court found that the detective's statements did not constitute a promise. However, a promise does not have to be direct to render a confession involuntary, but can be implied. See Almeida v. State, 737 So.2d 520 (Fla.1999) (holding that to exclude confession as testimony, it is not necessary that any direct promises or threats be made to the accused; it is sufficient, if attending circumstances, or declarations of *442 those present, be calculated to delude suspect as to his true position, and exert improper and undue influence over his mind); Johnson. Here, the videotape from June 26 clearly shows an implied, if not a direct, promise on the part of Detective Petty that if Ms. Albritton confessed that she committed the offense as part of a religious ritual, she would be constitutionally protected and could not be prosecuted.
The trial court's second reason for denying the motion to suppress was that there was no nexus between the detective's statements regarding the religious ritual and Ms. Albritton's confession because she testified at the hearing that she confessed in order to protect her son. We disagree. Whatever her ulterior motive for the confession, it was clearly induced by the detective's assurance that if there were a religious motive behind the mutilation, Ms. Albritton would not be prosecuted. Initially, and for some period of time, Ms. Albritton denied any knowledge of the incident in question. However, immediately after the detective's statements regarding the constitutional protections applied to religious activity, Ms. Albritton confessed. In fact, just after the detective first explained the religious exemption, Ms. Albritton's initial inculpatory statement was, "Yeah, it was religious," and throughout her whole confession she explained all her acts as being part of a religious ritual.
The State argues that even if this court deems Ms. Albritton's confession on the June 26 videotape to be involuntary, her statements the following day were not involuntary because she had been informed of her Miranda warnings at the close of the interview on June 26. However, in this case, at the end of the first interview, Detective Petty told Ms. Albritton that he needed to talk with the State Attorney's Office to see what could be worked out, that she might not be charged with a serious crime, but that there might be some lesser charge due to the fact that the hand was thrown into the river. Detective Petty's statements inferred that he would be working with the State on Ms. Albritton's behalf and that any charges filed would not be for mutilating the body, although these charges could be less serious than the potential twenty-five years in prison of which he had earlier warned her. We also note that Ms. Albritton was not arrested on June 27, which was the day she gave her second videotaped interview. In fact, she was not arrested until June 29. Once it is established that a confession is involuntary, a subsequent confession is presumed to be involuntary also unless it is clearly shown the "influences attendant upon [the] initial confession" were dissipated prior to the subsequent confession. Brewer v. State, 386 So.2d 232, 236 (Fla. 1980). In the present case, we conclude that the influence of Detective Petty's promise to Ms. Albritton that she would not be prosecuted for a second-degree felony if she had been engaging in a religious ritual was not sufficiently dissipated at the time of her second confession on June 27 to allow its introduction into evidence.
For the reasons we have expressed, we reverse the trial court's denial of Ms. Albritton's motion to suppress regarding the June 26 and 27 videotapes and any other statements made on those days.[3] We note that in her written motion, Ms. Albritton also moved to suppress statements she made to the police during the June 29 videotaped interview. The trial court correctly struck the written motion as facially insufficient but allowed Ms. Albritton to present the motion orally. No testimony or argument, other than the fact that this interview was conducted by officer Al Cross, was presented by the parties at the hearing on the motion to suppress regarding the June 29 statements. Furthermore, these statements were not introduced into evidence at trial. The record does not indicate whether Ms. Albritton was arrested prior to her making the statements or what she was told at the time of such *443 arrest. It could very well be that any taint from the earlier promises was dissipated by the time the June 29 statements were made. At the hearing on the motion to suppress, Detective Petty indicated that the questions during the interview on June 29 were directed to rituals Ms. Albritton may have performed on other bodies. We note that if there is a retrial in this case, any testimony regarding other rituals would only be admissible if it met the stringent requirements applied to similar fact evidence. Otherwise, any probative value would be outweighed by the prejudice to the defendant.
Without the introduction of the statements made by Ms. Albritton on June 26 and 27, the State did not present a prima facie case on the charge of abuse of a dead body. The error in admitting the statements cannot, therefore, be considered harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Reversed and remanded with instructions.
BLUE, A.C.J., and WHATLEY, J., Concur.
NOTES
[1] This statement is incorrect. A second-degree felony is punishable by up to fifteen years in prison absent the defendant being sentenced as a habitual offender or a sentencing guidelines score that exceeds the statutory maximum. See § 775.082(3)(c), Fla. Stat. (1997).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Appellant did not move to suppress any tangible evidence such as the scalpel.