803 So.2d 598 (2001)
Seburt Nelson CONNOR, Appellant,
v.
STATE of Florida, Appellee.
No. SC93697.
Supreme Court of Florida.
September 6, 2001.
Rehearing Denied December 17, 2001.
*601 Bennett H. Brummer, Public Defender, and Louis Campbell, Assistant Public Defender, Eleventh Judicial Circuit, Miami, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Fariba N. Komeily, Miami, FL, and Charmaine Millsaps, Tallahassee, FL, Assistant Attorneys General, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Seburt Nelson Connor. We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution. For the reasons expressed below, we affirm the convictions and sentences, including the sentence of death.
Connor was arrested in Miami on Saturday, November 21, 1992, for the double murder of Lawrence Goodine and Jessica Goodine. The record establishes the following facts surrounding the crimes.
In the 1970s, Connor began an extramarital affair with Margaret Bennett. When Bennett found out that Connor was *602 married, she ended the relationship. In 1979, Margaret married Lawrence Goodine and the couple had two children, Karen and Jessica. Margaret later separated from Lawrence and in 1988 she renewed her relationship with Connor. Connor became a father figure to Margaret's two children. However, in early 1992, Margaret told Connor that she did not want to see him anymore.
Over the next several months, Connor allegedly harassed Margaret. Her house was burglarized a number of times, with the burglar taking bed sheets, towels and linens. One witness stated that she observed Connor shoot a gun at Margaret's house as he drove by. One of Margaret's neighbors testified that she received a threatening phone call from a person who she believed was Connor. The caller stated that he was going to kill Margaret and her daughter Karen.
On July 28, 1992, Margaret obtained an ex parte domestic violence injunction against Connor. A permanent injunction was issued on August 19, 1992. Connor told one of Margaret's neighbors that he would stop bothering Margaret if she would go back to her husband Lawrence Goodine. In September of 1992, Margaret complied with Connor's request and asked Lawrence to move back into her house. In October of 1992, Connor purchased a black 1986 Cadillac, a car that was identical to the car that Margaret already owned. A neighbor testified that she would often see a black Cadillac driving slowly through the neighborhood.
On Thursday, November 19, 1992, Margaret left for work in the morning and her daughters Karen and Jessica (age 10) went to school. Lawrence Goodine remained in the house. He was last seen at the house at 2:30 p.m. Jessica returned home after school and went across the street to play with one of her friends. While the girls were playing, they noticed a black Cadillac at Jessica's house, so Jessica went home. Jessica came back shortly thereafter and told her friend that she was leaving. Jessica left in the Cadillac and Jessica's friend testified that she thought Jessica left with her father.
Jessica's sister Karen came home at approximately 6 p.m. Karen called her mother and told her that neither Lawrence nor Jessica was home and that it appeared that someone had been in the house. Margaret told Jessica to call the police. When Margaret arrived home, she told the police that she thought Connor had something to do with the disappearances. The police called the Connor residence Thursday night and spoke to Mr. and Mrs. Connor. Detective Murias later went to the Connor house at about 3 a.m. on Friday, November 20. A black Cadillac was parked outside the house. The property where the Connors lived contained a house and a separate "cottage" behind the house. When Detective Murias arrived, Mr. Connor was in the cottage and Mrs. Connor went around to get him. When asked about the disappearances, Mr. Connor told Detective Murias that he did not have any contact with Jessica or Lawrence that day.
Late in the afternoon on Friday, November 20, 1992 (one day after Lawrence and Jessica disappeared), Lawrence's body was found in a wooded area near the Fort Lauderdale airport. The cause of death was multiple blunt trauma to the head. He was hit on the head five times and each of the blows would have rendered him unconscious and each was fatal. When his body was removed at 4:30 p.m., he had been dead about 24 hours.
When the detectives went to the Goodine house to report the discovery of Lawrence's body, they noticed blood on the living room carpet and on the wall. Subsequent tests revealed that the blood was *603 probably Lawrence's. The police also noticed a broken chair. Apparently the killer hit Lawrence over the head with a leg from the chair.
The search for Jessica intensified with the discovery of Lawrence's body. Several police officers returned to Connor's house at 2 a.m. on Saturday, November 21 (approximately four hours after the police discovered the blood at the Goodine residence). The police did not go to the house to arrest Connor; they only went to the house to question him. When Mrs. Connor answered the door, Detective Murias and Detective Tymes told her that they wanted to speak to Mr. Connor. Mr. Connor came out of the bedroom wearing pajamas, and Detective Tymes told Mr. Connor that she "needed to further talk to him" at her office. Mr. Connor asked if he could get dressed and he was given permission to do so. Detective Tymes stated that Mr. Connor voluntarily agreed to go to the station. As they left the house, Detective Tymes asked Mr. Connor if she could search the Cadillac. He agreed and she filled out a consent form and Mr. Connor signed it. Detective Tymes searched the car and noticed blood stains on the rear seat and in the trunk. Mr. Connor rode with Detective Tymes to the police station. Mr. Connor sat in the front seat and was not handcuffed. While Mr. Connor was on his way to the station, Detective Murias and another detective searched the cottage pursuant to Mrs. Connor's consent. The detectives did not see anything suspicious.
Once Mr. Connor and Detective Tymes arrived at the station, Detective Tymes advised Mr. Connor of his Miranda[1] rights, and Mr. Connor signed a standard waiver form. Detective Tymes testified that Mr. Connor was not told that he was under arrest but that in her mind, Mr. Connor was not free to leave. During the questioning, Detective Tymes noticed blood on Mr. Connor's socks and shoes. When asked about the blood, Mr. Connor stated that he had a cut on his leg. Detective Tymes asked Mr. Connor if she could take his socks and shoes, and Mr. Connor consented and signed a consent form. Subsequent DNA tests revealed that the blood on the socks and shoes was that of Lawrence Goodine. Detective Tymes then asked Mr. Connor for permission to search the house and cottage. Mr. Connor agreed and signed another consent form.
Two other detectives went to the Connor residence about 5 a.m. on Saturday morning, November 21. The detectives obtained written consent to search the house from Mrs. Connor and her daughter. After being asked by the detectives, Mrs. Connor handed over the clothes that Mr. Connor was wearing on Thursday, November 19. The clothes appeared to have blood stains on them, and subsequent tests revealed that the blood belonged to Lawrence Goodine.
The police obtained a search warrant in order to remove the Cadillac for further processing. The Cadillac was towed about 11 a.m. on Saturday, November 21. Blood stains were found on the pouch behind the driver's seat and on the rear seat. Subsequent DNA tests revealed that the blood was Lawrence Goodine's.
Around 11 a.m. on Saturday, November 21, the police conducted another search of the cottage. The police discovered the body of Jessica wedged between the bed and the wall, wrapped in a comforter. The medical examiner testified that Jessica probably died sometime late on Friday. The cause of death was asphyxia by manual strangulation. Her eyes were puffy, *604 indicating that she had been crying and there was residue of duct tape on her face. A hand had been pressed down over her mouth with sufficient force to cause hemorrhaging along the gum margin. Mr. Connor was arrested at 12:30 p.m. on Saturday, November 21.
Prior to trial, defense counsel filed a motion to declare that Connor was incompetent. After a competency hearing, the trial court found that Connor was competent to stand trial. Months later, during jury selection, the trial court held another competency hearing and again found that Connor was competent. The case proceeded to trial, and Connor testified during the guilt phase, claiming that the State planted the evidence and Jessica's body in his house. He stated that the police were trying to get revenge against him for filing a previous civil suit against them. At the conclusion of the guilt phase, Connor was convicted of two counts of first-degree murder, kidnapping, and burglary.
After the penalty phase, the jury recommended death by an eight-to-four vote for the murder of Jessica Goodine and life for the murder of Lawrence Goodine. The trial court found the following five aggravators for the murder of Jessica Goodine: (1) previous capital felony (murder of Lawrence), (2) murder committed while engaged in the commission of a kidnapping, (3) murder committed to avoid arrest, (4) the murder was heinous, atrocious, or cruel (HAC), and (5) the murder was cold, calculated, and premeditated (CCP). The trial court concluded that Connor failed to establish the statutory mental mitigators but did find the nonstatutory mental mitigator that Connor suffered from a mental illness at the time of the offense. The court gave this mitigator substantial weight. The court also found the following nonstatutory mental mitigators: (1) Connor is a good father; (2) Connor will die in prison if given life sentences; and (3) Connor has had no disciplinary problems in prison. The court assigned these mitigators small or little weight. The trial court ultimately sentenced Connor to death for the murder of Jessica Goodine. The trial court also imposed a life sentence for the murder of Lawrence Goodine and consecutive sentences of twenty years for the kidnapping and burglary.
Connor presents six claims in this appeal: (1) the trial court erred in denying Connor's motion to suppress evidence; (2) the trial court erred in finding the avoid arrest aggravator; (3) the trial court erred in finding CCP; (4) the trial court erred in rejecting the statutory mitigators of extreme emotional disturbance and impaired capacity to appreciate the criminality of conduct; (5) the trial court erred in rejecting the statutory mitigator of no significant criminal history; and (6) the sentence of death is disproportionate. We address the issues in turn, beginning with the alleged claim of error during the guilt phase of the trial.
In his first claim, Connor asserts that the trial court erred in denying his motion to suppress his socks and shoes, the clothing seized from his house, the body of Jessica Goodine, and the evidence seized from his car. Connor claims in this appeal that he was illegally arrested when the police came to his house on November 21, 1992, at 2 a.m. Connor further claims that this illegal arrest tainted the subsequent consents that he gave for the searches of his house, his car, and his clothes.
The State responds by claiming that the detectives had probable cause to arrest Connor when they initially approached the house on November 21. We disagree. Detective Tymes, the detective who approached Connor on the night in question, stated in the record that she did not have probable cause to arrest Connor *605 when she approached the Connor house, and therefore she was not going to arrest Connor but rather was going to attempt to get him to voluntarily come to the station to answer some questions. Further, despite the State's assertions in this appeal, whatever evidence the police had in their possession when they approached the house on November 21, this evidence did not amount to probable cause.
The State argues in the alternative that even if the detectives did not have probable cause to arrest Connor, the encounter was still permissible because Connor voluntarily agreed to go to the station. We agree.
In order for a court to conclude that a suspect was in custody, it must be evident that, under the totality of the circumstances, a reasonable person in the suspect's position would feel a restraint of his or her freedom of movement, fairly characterized, so that the suspect would not feel free to leave or to terminate the encounter with police. See Voorhees v. State, 699 So.2d 602, 608 (Fla.1997) (citing Florida v. Bostick, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). This Court previously has accorded great deference to a trial court's ruling on a motion to suppress: "A trial court's ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court's ruling." Murray v. State, 692 So.2d 157, 159 (Fla.1997); see also Walker v. State, 707 So.2d 300, 311 (Fla.1997) ("[A] trial court's ruling on a motion to suppress is accorded great deference."); Escobar v. State, 699 So.2d 988, 993-94 (Fla.1997). Significantly, however, the question of whether a suspect is in custody is a mixed question of law and fact. See Ramirez v. State, 739 So.2d 568, 574 (Fla.1999) (citing Thompson v. Keohane, 516 U.S. 99, 106-07, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)); Jacobs v. Singletary, 952 F.2d 1282, 1291 (11th Cir.1992). As stated by the United States Supreme Court, mixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue. See United States v. Bajakajian, 524 U.S. 321, 337 n. 10, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998); Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Adams, 1 F.3d 1566, 1575 (11th Cir.1993) (citing Jacobs, 952 F.2d at 1291).
In Ornelas, the Supreme Court utilized this two-step approach in its appellate review of determinations of probable cause and reasonable suspicion, also mixed issues of law and fact:
[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences from these facts by resident judges and local law enforcement officers.
517 U.S. at 669, 116 S.Ct. 1638 (emphasis supplied). The Court provided the following policy reasons for its decision:
A policy of sweeping deference would permit, "[i]n the absence of any significant difference in the facts," "the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause." Such varied results would be inconsistent with the idea of a unitary *606 system of law. This, if a matter-of-course, would be unacceptable.
In addition, the legal rules for probable cause and reasonable suspicion acquire content only through application. Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles.
Finally, de novo review tends to unify precedent and will come closer to providing law enforcement officers with a defined "`set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.'"
Id. at 697-98, 116 S.Ct. 1638 (citations omitted). Thus, the Court concluded that an appellate court has an independent obligation to review the ultimate question of probable cause and reasonable suspicion using a de novo standard to ensure that the actions of the police were within constitutionally acceptable parameters, and to further ensure the uniformity of results among decisions based on similar facts.
Even before its decision in Ornelas, the Supreme Court held in a Fifth Amendment context that a state court's determination that a defendant was "in custody" for Miranda purposes was not a matter entitled to a presumption of correctness, but rather a mixed question of fact and law warranting independent review in petitions for federal habeas relief:
Two discrete inquiries are essential to the determination [of whether a defendant was "in custody" for Miranda purposes]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.... The first inquiry, all agree, is distinctly factual. State-court findings on these scene- and action-setting questions attract a presumption of correctness [under federal statutory law]. The second inquiry, however, calls for application of the controlling legal standard to the historical facts. This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.
. . . .
Classifying "in custody" as a determination qualifying for independent review should serve legitimate law enforcement interests as effectively as it serves to ensure protection of the right against self-incrimination. As our decisions bear out, the law declaration aspect of independent review potentially may guide police, unify precedent, and stabilize the law.
Thompson v. Keohane, 516 U.S. 99, 112-15, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (citations and footnote omitted).
Although this Court has not yet done so, other courts have considered and extended the Ornelas rationale and de novo standard of review to mixed questions of law and fact in the Fifth Amendment context:
The Ornelas Court established that appellate courts are to review de novo the ultimate questions of reasonable suspicion and probable cause. Since Ornelas, we have followed that reasoning [in the Fifth Amendment context] by requiring independent review of the [trial] court's determination of whether the interrogation was custodial, whether the confession was voluntary, and whether the Miranda waiver was voluntary. However, our review of the [trial] court's findings of historical fact is deferential; absent clear error, we shall not reverse those findings.
*607 United States v. Westbrook, 125 F.3d 996, 1001 (7th Cir.1997) (citations omitted); see also Adams, 1 F.3d at 1575; Jacobs, 952 F.2d at 1291; State v. Campbell, 691 A.2d 564, 569 (R.I.1997) (applying Ornelas de novo standard to voluntariness of Miranda waiver, holding "[t]his Court will review de novo legal questions and mixed questions of law and fact insofar as those issues impact on constitutional matters, pursuant to Ornelas."); State v. Searls, 118 Ohio App.3d 739, 693 N.E.2d 1184 (1997) (applying Ornelas de novo standard to waiver of Miranda rights).
Despite our previous statements that a trial court's ruling on a motion to suppress will be upheld if supported by competent substantial evidence in the record, see, e.g., Hawk v. State, 718 So.2d 159, 161 (Fla. 1998); Escobar v. State, 699 So.2d 988, 994 (Fla.1997), a careful review of the analysis in many cases involving suppression issues reveals that this Court has in fact independently reviewed the application of the legal standard to the facts found by the trial court.[2]
Further, we have recognized our obligation to review independently mixed questions of law and fact that ultimately determine constitutional rights most recently in Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999). As we explained in Stephens:
The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review. In many instances, the trial court is in a superior position "to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses." When sitting as the trier of fact, the trial judge has the "superior vantage point to see and hear the witnesses and judge their credibility." Appellate courts do not have this same opportunity.
Despite this deference to a trial court's findings of fact, the appellate court's obligation to independently review mixed questions of fact and law of *608 constitutional magnitude is also an extremely important appellate principle. This obligation stems from the appellate court's responsibilities to ensure that the law is applied uniformly in decisions based on similar facts and that the defendant's representation is within constitutionally acceptable parameters.
Id. at 1034.
Accordingly, for the same underlying policy reasons enunciated in Ornelas and Thompson, appellate courts should continue to accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts, but appellate courts must independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendment and, by extension, article I, section 9 of the Florida Constitution.[3] We note that the majority of appellate courts have in fact been adhering to the reasoning of Ornelas in their appellate review. See Albritton v. State, 769 So.2d 438 (Fla. 2d DCA 2000) (stating that although a "trial court's ruling on a motion to suppress is presumptively correct ... the ultimate issue of the voluntariness of a confession is a legal question requiring independent review"); State v. Gandy, 766 So.2d 1234 (Fla. 1st DCA 2000) (same); Porter v. State, 765 So.2d 76 (Fla. 4th DCA 2000) (same); Sims v. State, 743 So.2d 97 (Fla. 1st DCA 1999) (same); State v. Wikso, 738 So.2d 390 (Fla. 4th DCA 1999) (same); Warren v. State, 701 So.2d 404 (Fla. 1st DCA 1997) (same). These opinions state that the determination of whether the application of the law to the historical facts establishes an adequate basis for the trial court's ruling is subject to de novo review. See id.[4]
Consistent with our prior precedent, applying the analysis used in Ornelas and Thompson to this case would still give a strong presumption of correctness to the trial court's determinations of historical fact, reversing those only if not supported by competent substantial evidence in the record. However, in determining whether the defendant was "in custody" at the time he consented to allowing the police to search, we have the responsibility of making an independent determination and review the application of law to those facts de novo. See Adams, 1 F.3d at 1575 (citing Jacobs, 952 F.2d at 1291); Albritton, 769 So.2d at 441; Gandy, 766 So.2d at 1235; Porter, 765 So.2d at 77.
In its order denying Connor's motion to suppress, the trial court determined that Connor was not in custody when he left with the police to go to the station. The trial court applied the correct test for making this determination: whether a reasonable person would have believed that he or she was free to leave. See Voorhees, 699 So.2d at 608. Based on the two-step approach enunciated in Ornelas, we find that competent substantial evidence supports the trial court's findings of historical fact. Moreover, based on these findings, we hold that the trial court reached the correct legal conclusion that Connor was not in police custody when he left to go to the station and that the items seized by the police from Connor's house and car were the result of a consensual search.
*609 Even if the trial court erred in concluding that Connor was not in custody when he left with the police to go to the station, this error was harmless, as any error in this regard did not affect the verdict in this case. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). In Norman v. State, 379 So.2d 643, 646-47 (Fla.1980), this Court stated:
The voluntariness vel non of the defendant's consent to search is to be determined from the totality of circumstances. But when consent is obtained after illegal police activity such as an illegal search or arrest, the unlawful police action presumptively taints and renders involuntary any consent to search. Bailey v. State, 319 So.2d 22 (Fla.1975); Earman v. State, 265 So.2d 695 (Fla. 1972); Taylor v. State, 355 So.2d 180 (Fla. 3d DCA 1978). See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The consent will be held voluntary only if there is clear and convincing proof of an unequivocal break in the chain of illegality sufficient to dissipate the taint of prior official illegal action. Bailey v. State, 319 So.2d at 28; Sheff v. State, 329 So.2d 270 (Fla.1976).
Hence our inquiry in this case is twofold. We first must ascertain whether the sheriff's initial intrusion into the farm and tobacco shed violated petitioner's fourth amendment rights; second, if in fact the intrusion was unlawful, it must be determined whether the state, by clear and convincing evidence, has carried its burden of showing an unequivocal break between the prior illegal entry and petitioner's subsequent consent to search.
We conclude that there is clear and convincing proof in this case of an unequivocal break in the alleged chain of illegality sufficient to dissipate any taint of prior official illegal action. If the police illegally arrested Connor, they did not use this to their advantage when obtaining the subsequent consents to search the car, the clothes, or the house.
The United States Supreme Court addressed an analogous situation in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In Brown, the defendant was illegally arrested and subsequently confessed. The question in the case was whether the giving of Miranda warnings prior to the confession broke the taint from the prior arrest. The Supreme Court provided the following list of factors to consider when determining whether the taint from previous police misconduct has been broken: whether Miranda warnings have been given, the temporal proximity of the misconduct and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the misconduct. See id. at 603-04, 95 S.Ct. 2254.
In the present case, the police obtained oral and written consents from Connor prior to searching the car, taking the shoes and socks, and searching the house. Connor was informed of his right to refuse the searches. Before being questioned, Connor was given Miranda warnings and he waived his rights in writing. Under these circumstances, even if the initial encounter was illegal, any taint from that encounter did not extend to the subsequent consents. Hence, there is no merit to Connor's first claim of error.
After reviewing all of the evidence in the record, we find that there is competent, substantial evidence to support Connor's convictions for two counts of firstdegree murder, kidnapping, and burglary. The remainder of the alleged claims of error concern the penalty phase.
*610 Connor's second claim concerns whether the trial court erred in finding the avoid arrest aggravator. To establish the avoid arrest aggravating factor where the victim is not a law enforcement officer, the State must show beyond a reasonable doubt that the sole or dominant motive for the murder was the elimination of a witness. See Alston v. State, 723 So.2d 148, 160 (Fla.1998). Mere speculation on the part of the State that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. See Jennings v. State, 718 So.2d 144 (Fla.1998). A trial court's conclusion regarding an aggravator should be upheld if the trial court applied the correct rule of law and the trial court's findings are supported by competent, substantial evidence. See Willacy v. State, 696 So.2d 693, 696 (Fla.1997).
The State argues that the evidence in the record establishes that the sole or dominant motive for the murder of Jessica case was to avoid arrest. The State asserts that Jessica returned home when Connor was in the process of cleaning up the murder scene of Lawrence Goodine. The State contends that whether or not Jessica witnessed the murder or saw her father's dead body, she could at the very least place Connor at the murder scene.
Our review of the record reveals that there is insufficient evidence to support the trial court's conclusion that the State proved the avoid arrest aggravator beyond a reasonable doubt. Although the State's theory regarding Jessica's murder is possible, it is certainly also plausible that Connor's motive for killing Jessica had nothing to do with witness elimination but rather was related to his obsession with Margaret and was part of a plan to hurt Margaret by killing one of her daughters. In fact, there is evidence in the record that a neighbor of the Goodine's received a call from Connor, who threatened to kill Margaret and her daughter Karen.
Yet, despite our finding of error on this issue, we conclude beyond a reasonable doubt that this error did not affect the ultimate sentence. See DiGuilio. As explained below, even after striking this aggravator, four other aggravators remain, and under the circumstances of this case, the sentence is still proportionate.
In claim three, Connor asserts that the trial court erred in finding CCP. In order to establish CCP, the State must establish that the killing was the product of cool and calm reflection and was not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification. See Jackson v. State, 648 So.2d 85, 89 (Fla.1994).
In the sentencing order, the trial court stated the following regarding this aggravator:
The defendant took Jessica Goodine from her home. He hid her for a full day while contemplating his decision to murder her. The manner he chose to murder the child for whom he professed affection was especially cold. The type of murder he chose was one which was noiseless but not instantaneous. Dr. Rao testified that she struggled in her last moments, indicated by the hemorrhage in the gum margins. The defendant coldly and calculatingly hid the child. When questioned by Detective Sarah Tymes, he did not show any anger or emotion. He was calm, cool and collected. His responses were thoughtful *611 and enigmatic. "Do I look like a killer?", he asked Detective Tymes.
Mr. Connor witnessed all of the child's tears and struggles, first as he bound her and gagged her, and hours later as he placed his hands around her throat pressing harder and harder until her life was ended. He chose a specific manner and means of death. He had a significant period of time to contemplate and consider his alternatives.
The Court finds that the elapsed time of a full day between the kidnapping and the murder indicates a heightened premeditation. There is no evidence that his actions were preformed in a rage or panic. The Court does not believe that the defendant's mental illness, that is, some organicity and some paranoid ideation, reached such a severity that it interfered with Mr. Connor's ability to perceive events, or to coldly plan and carry out his murder of Jessica. Rather, the manner and means of death were done in a highly premeditated fashion, without any moral or legal justification. The Court finds that the State has proved this aggravating factor beyond a reasonable doubt and gives it great weight.
(Footnote omitted.) The trial court applied the correct rule of law and the trial court's conclusion regarding this aggravator is supported by competent, substantial evidence. Therefore, we find no merit to this issue.
In Connor's fourth claim, he alleges that the trial court erred in rejecting the statutory mitigators of extreme mental or emotional disturbance and impaired capacity to appreciate or conform his conduct to the requirements of law. The trial court's analysis concerning these mitigators is thorough and is no less than eight or nine pages. The trial court considered expert testimony from seven mental health experts. Some of these experts testified at one of the two competency hearings. With Connor's consent, the trial court considered all of the evidence in the record that related to Connor's mental condition, even the testimony from the competency hearings.[5] The trial court found the existence of nonstatutory mental mitigation, but concluded that the evidence did not rise to the level of statutory mental mitigation. The trial court did give this nonstatutory mitigator substantial weight.
Connor claims that the record establishes that these mitigators were proven and therefore it was error for the trial court to reject these two statutory mental mitigators. It is true that Dr. Eisenstein and Dr. Mosman both testified that Connor suffered from an extreme mental or emotional disturbance and that Connor's capacity to appreciate the criminality of his conduct was impaired. In contrast to this testimony, Dr. Garcia testified that neither of the statutory mental mitigators applied to Connor. Dr. Levy stated that Connor's responses to certain tests were aligned with people who do not suffer from any major emotional disorder. Dr. Herrera did not find any psychiatric disorder. Dr. Ansley stated that she did not find any gross organic brain dysfunction. Dr. Jacobson stated that there was evidence of organicity and some cognitive dysfunction but that Connor is not nonfunctional.
A trial court may reject a claim that a mitigating circumstance has been proven provided that the record contains competent, substantial evidence to support the rejection. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990). Further, a trial court has the discretion to reject a *612 statutory mental mitigator if the mental health experts are in disagreement regarding whether the mitigator exists. See Walker v. State, 707 So.2d 300, 318 (Fla. 1997).
In the present case, the trial court had the discretion to resolve the conflict in the testimony in favor of the State, and there is competent, substantial evidence in the record to support the trial court's conclusions on this issue. Therefore, there is no merit to Connor's claim of error.
In his next claim, Connor alleges that the trial court erred in rejecting the statutory mitigator of no significant criminal history. In rejecting this mitigator, the trial court cited to Connor's previous burglaries of the Goodine home, Connor's threatening phone call(s) to the Goodine family, and Connor's conduct in throwing paint on a car parked in front of the Goodine home. Connor claims that all of this conduct amounted to one lengthy criminal incident and was substantially related to the murders. See Craig v. State, 685 So.2d 1224 (Fla.1996).
We find that the facts of Craig are distinguishable from the present case. In that case, the defendant, a cattle ranch manager, was stealing cattle from the owner. When the owner became aware of the thefts, the defendant murdered him. The trial court found that the "no prior criminal history" mitigator was established, concluding that the cattle thefts were an integral part of the case. On appeal, this Court affirmed, stating that there was evidence in the record to support the trial court's conclusion that the cattle thefts were substantially related to the murders.
In the instant case, each of the previous crimes appears to be a singular, discrete act, and thus they were not a part of one lengthy criminal incident. See Pardo v. State, 563 So.2d 77, 81 (Fla.1990). Hence, we find no merit to this claim.
Finally, Connor claims that the death sentence in this case is disproportionate. Proportionality review is not simply a comparison between the number of aggravating and mitigating circumstances. See Terry v. State, 668 So.2d 954, 965 (Fla.1996). This Court's function in a proportionality review is not to reweigh the mitigating factors against the aggravating factors; that is the function of the trial judge. See Bates v. State, 750 So.2d 6, 12 (Fla.1999). This Court's proportionality review requires it to "consider the totality of circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). The death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
In the present case, the trial court found five aggravators: murder committed to avoid arrest, CCP, HAC, murder committed while engaged in a kidnapping, and previous capital felony (the murder of Lawrence Goodine). The trial court did not find any statutory mitigators. The trial court found four nonstatutory mitigators: Connor suffered from a mental illness at the time of the crime, Connor was a good father, Connor would die in prison if given a life sentence, and Connor had no disciplinary problems in prison. Even after striking the avoid-arrest aggravator, the four remaining aggravators still support a death sentence in this case.
The circumstances of this case are similar to other cases where the death penalty has been upheld by this Court. For instance, in Zakrzewski v. State, 717 So.2d 488 (Fla.1998), the defendant murdered his wife and two young children. The trial court found three aggravators: previous capital felony (contemporaneous murders), *613 CCP, and HAC. The trial court also found two statutory mitigators (extreme disturbance and no prior criminal history) and a number of nonstatutory mitigators. Additionally, in Arbelaez v. State, 626 So.2d 169 (Fla.1993), the defendant killed his ex-girlfriend's young boy in order to get revenge. The defendant shook the child and squeezed his neck before throwing him over a bridge into water seventy feet below. The trial court found three aggravators: HAC, CCP, and death during the kidnapping of a child. In mitigation, the trial court found that Arbelaez had no significant history of prior criminal activity and the nonstatutory mitigating circumstance of remorse. Based on these cases, we find that the death sentence is proportionate in this case.
Accordingly, for the reasons stated in this opinion, we affirm the convictions and sentences, including the sentence of death.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., concurs with an opinion.
WELLS, C.J., concurring.
I concur in the result in this case, both as to the conviction and sentence. I do not join in the opinion in respect to the extended discussion of the standard of review in respect to the motion to suppress. I find this Court's precedent is not in line with that discussion. I would continue to follow Murray v. State, 692 So.2d 157 (Fla.1997); Escobar v. State, 699 So.2d 988 (Fla.1997); and Walker v. State, 707 So.2d 300 (Fla. 1997).
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] See, e.g., Alston v. State, 723 So.2d 148, 154 (Fla.1998) (reviewing circumstances of confession and concluding police statements were "insufficient" to render statement involuntary, so that trial court did not err in ruling the statements admissible); Walker v. State, 707 So.2d 300, 311 (Fla.1997) (reviewing circumstances of confession, finding the record supported the trial court's ruling, and affirming because "the police interrogation here simply cannot be characterized as so coercive as to render [appellant's] confession involuntary"); Maqueira v. State, 588 So.2d 221 (Fla. 1991) (finding record supported the trial court's ruling, and concluding "[w]e find that there were no promises made to [the defendant] that would vitiate his confession"); Brown v. State, 565 So.2d 304, 306 (Fla.1990) (reviewing circumstances of confession and legal standard of voluntariness and concluding that "[i]n the absence of any coercion his claim that he had been without sleep and was exhausted does not overcome the voluntariness of his statement"), abrogated on other grounds, Jackson v. State, 648 So.2d 85 (Fla. 1994); Owen v. State, 560 So.2d 207, 210 (Fla.1990) (finding that the video-taped confession "show[s] that the confession was entirely voluntary"), receded from on other grounds, State v. Owen, 696 So.2d 715 (Fla. 1997); Bush v. State, 461 So.2d 936, 939 (Fla.1984) ("Under the totality of the circumstances, the statements made to [the defendant] did not overcome his will and produce the confession."); Brewer v. State, 386 So.2d 232, 237 (Fla.1980) ("Upon examining the totality of the circumstances surrounding the confession, we conclude" that the trial court erred in ruling the confession to be voluntary); Ashley v. State, 265 So.2d 685, 689-90 (Fla.1972) ("We have carefully reviewed the circumstances surrounding the giving of the statement ... and find that the confession was voluntarily and freely made."). The above cases illustrate that this Court has previously exercised its independent obligation to ensure that the minimum constitutional requirements of voluntariness have been complied with before holding that a confession is admissible against a defendant.
[3] Our holding regarding the proper standard of review of a trial court's ruling on a motion to suppress will have no retroactive application to cases final as of the date this opinion is released.
[4] But see Shannon v. State, 753 So.2d 148 (Fla. 3d DCA 2000); Morris v. State, 749 So.2d 590 (Fla. 5th DCA 2000); A.J.M. v. State, 746 So.2d 1222 (Fla. 3d DCA 1999); State v. Jackson, 744 So.2d 545 (Fla. 5th DCA 1999).
[5] Dr. Levy, Dr. Herrera, Dr. Jacobson, and Dr. Ansley only testified at one or both of the competency hearings and did not testify during the penalty phase.