NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

JAMES JOHNS, III,                    )
                                     )
          Appellant,                 )
                                     )
v.                                   )          Case No. 2D17-420
                                     )
STATE OF FLORIDA,                    )
                                     )
          Appellee.                  )
_____)

Opinion filed April 13, 2018.

Appeal from the Circuit Court for Polk
County; Reinaldo Ojeda, Judge.

Terry P. Roberts of Law Office of Terry P.
Roberts, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee; Dawn A. Tiffin and Bilah
Ahmed Faruqui, Assistant Attorneys
General, Tampa, for Appellee.


LUCAS, Judge.

          A mysterious parcel package was intercepted while en route to be

delivered.  It contained approximately ten pounds of marijuana.  Someone sent the

package.  Someone was presumably going to pick it up.  The principal question this

appeal presents is whether investigating detectives had a reasonable suspicion that

James Johns, III, was somehow involved with this contraband when they detained him in the driveway of the package's destination. We hold they did not.

I.

In early December 2012, a detective monitoring shipments in a UPS facility discovered a suspicious looking package from "The Party Animal" addressed to a fictitious person named "Raymond Maven" that was on its way to be delivered to an address on West Dossey Road in Lakeland. He obtained a search warrant, opened it, and found about ten pounds of marijuana in heat-sealed bags.[1] Polk County Sheriff's detectives then began surveilling the package's listed address, which turned out to be a fairly nondescript duplex in a residential neighborhood. They could only maintain intermittent visual contact with the duplex (without risking being detected). This is what they saw.

At approximately 9:00 a.m. on December 4, 2012, Detective John Ripke observed a white male drive up to the duplex driveway in a tan Buick. This man would eventually be identified as Donald Mason—Mr. Johns' brother. Detective Ripke saw the residents of the duplex unit, Maurice Whitaker and his girlfriend, Tiffany Douglas, come outside to speak with Mr. Mason. While milling about together in the driveway, Mr. Mason made a call on his cell phone and engaged in some kind of conversation as he paced up and down, but the detective, who was still parked in his automobile some distance away, could not hear any details of what was said. After approximately fifteen minutes, Mr. Mason left, passing Detective Ripke's vehicle as he drove by.

---

[1]The facts relayed within this opinion derive from the hearing on Mr. Johns' motion to suppress.

At this point, Detective Ripke had been joined by Detectives Leslie and Edison in the surveillance. They decided to try delivering the package to see what would happen. As the detectives watched, Detective Edison, disguised as a UPS driver, approached the duplex, knocked on the unit door, and waited. No one ever answered, and so the disguised detective left without leaving the package behind. A short while later, Mr. Whitaker emerged from the unit's doorway and appeared to look around the front door and yard before returning inside.

At two o'clock in the afternoon the detectives decided to make contact with the duplex's residents directly. Wearing sheriff's office tactical vests, Detectives Ripke and Leslie knocked on the door and met Mr. Whitaker who allowed them inside. Mr. Whitaker denied that he was awaiting a package's delivery. When asked about the individual he had been seen conversing with in the driveway, Mr. Whitaker told Detective Ripke the man was someone he had met at a club the night before, that the man had come to the duplex that morning because he was interested in possibly renting a room in the unit, and that Mr. Whitaker only knew the man by the sobriquet, "Wee." Mr. Whitaker granted the detectives consent to search the unit, and they found nothing incriminating. Having spent much of the day watching a duplex detectives were certain was going to be utilized as a drop-off for a package of marijuana, and having twice unsuccessfully attempted to find a connection between the duplex unit's residents and that package, Detectives Ripke and Leslie had nearly completed their interview (with Detective Ripke warning Mr. Whitaker to be more careful about who he gives his address to) when Mr. Mason a/k/a Wee returned to the duplex.

This time, however, Mr. Mason was in a different car, a tan Hyundai Elantra that was owned and being driven by his brother—Mr. Johns. Both detectives approached Messrs. Mason and Johns in the driveway and commenced, what all appear to concede was, a Terry stop[2] of both brothers. The detectives obtained Messrs. Mason and Johns' drivers licenses, which were checked for outstanding warrants, patted both Mr. Mason and Mr. Johns down to search for weapons (none were found), and inquired about their reasons for coming to the duplex. Mr. Mason confirmed what Mr. Whitaker had told Detective Ripke earlier. That is, Mr. Mason stated he was interested in renting a room at the duplex. On closer inspection, Mr. Mason was observed to have a design cut into his hair that apparently resembled Popeye (the famed cartoon sailor) with the pipe spray-painted green. Mr. Mason explained to the detectives that the color green signified marijuana.[3]

With respect to Mr. Johns' presence, Mr. Mason told the detectives that he had met his brother at a Subway restaurant inside of a gas station nearby, where they had eaten lunch together and where Mr. Mason had left his car. When Detective Ripke was later asked at the suppression hearing what prompted this investigatory stop, he responded as follows:

> THE COURT: Let me ask you this. At this point in your mind is this a consensual encounter or is this more of a reasonable suspicion stop, or what's going on through your mind at this point?

---

[2]Terry v. Ohio, 392 U.S. 1 (1968).

[3]Mr. Johns, we may safely assume, had nothing so obtrusive in his appearance since neither detective described him with any more particularity than as a "white male." However, when asked whether he had ever been convicted of any offenses before, Mr. Johns answered truthfully that he had.

> THE WITNESS: It was more of a reasonable suspicion stop on Donald Mason.
>
> THE COURT: Uh-huh.
>
> THE WITNESS: And on James Johns it was a wonder why you're here.

Detective Ripke went on to explain that when a package of illegal drugs is trafficked through a delivery service, "[i]t is not uncommon for someone to arrive prior to the package arriving and position themselves in a place where they can monitor where the drop is." He further opined that his observations of Mr. Mason earlier that day in the driveway—pacing back and forth, looking around the area, conversing on a cell phone—as well as Mr. Mason's arrival at a drop-off point in a different vehicle were actions consistent with a drug dealer awaiting the arrival of a delivery of illegal drugs. Notably, neither detective could explain how their suspicion of Mr. Mason's actions extended to Mr. Johns beyond the fact that he was in Mr. Mason's company and driving his own car rather than his brother's.

Our record is not entirely clear about the precise chronology of what transpired during this investigatory stop. At some point, Detective Ripke asked Mr. Johns if he could search Mr. Johns' Hyundai. Mr. Johns declined the detective's request, upon which Detective Ripke, in Mr. Johns' presence, radioed for a K9 unit to join them at the duplex. After hearing the mention of an approaching K9 unit, Mr. Johns vacillated in his refusal to consent to his car's search; Detective Ripke responded that he would not search the vehicle because of Mr. Johns' prior refusal, but that he was "well within [his] right of contacting for a K-9." At some point, Mr. Johns asked whether he was under arrest; Detective Ripke replied that he was not. At another point, Mr.

Johns entered his car and started the vehicle as if to leave. Detective Ripke recounted what he then did:

> I go over there, I open his door, and I tell him, "What do you think you're doing?" He said, "I'm leaving. You told me I'm not under arrest." I said, "You're being detained" and I asked him to exit the vehicle – shut the vehicle off, exit the vehicle. He handed me the car keys. I placed them on top [of the car]. And he exited the vehicle and I said, "Don't do that again."

Eventually, another officer joined them at the duplex, who, in response to Mr. Johns' repeated requests to allow a search of his vehicle so that he could leave, helpfully provided a consent waiver. Mr. Johns executed the form, his car was searched, and Detective Ripke found a cigar laced with marijuana and shake[4] inside near the center console.

We need not recount the lengthy trail of warrants and evidence that proceeded from the arrest of Messrs. Mason and Johns. Suffice it to say that there were more illegal drugs found in Mr. Mason's car at the gas station, more incriminating evidence found on Mr. Mason's cell phone, and, pertinent here, the entirety of the evidence the State would use against Mr. Johns in the case at bar.[5]

Mr. Johns filed a motion to suppress this incriminating evidence. After hearing the evidence described above, the circuit court denied the motion. Pertinent to

---

[4]Detective Ripke explained that "shake . . . is pretty much leaves of marijuana – loose leaves."

[5]At the suppression hearing, the State was hesitant to concede this point. However, at oral argument, the State agreed with the trial court's determination announced on the record: all of the evidence the State could muster against Mr. Johns in his criminal prosecution would be "fruit of the poisonous tree" if there was not reasonable suspicion to conduct an investigatory stop of Mr. Johns.

Mr. Johns, the court concluded that the detectives had a reasonable suspicion that he had arrived at the duplex to look for the package of marijuana because: (1) Mr. Johns had arrived at a home that was under police surveillance; (2) he had arrived with Mr. Mason, who had been seen at the same duplex earlier and whose pot-smoking sailor hair design and furtive actions at the duplex (pacing in the driveway, talking on his cell phone, looking around) were "consistent with someone that is looking for a package of cannabis as opposed to someone that is looking to rent a room"; (3) Mr. Johns had no known reason to arrive at the duplex in "a recently switched out car," which the testifying detectives indicated was a "known drug dealer counter surveillance measure"; and (4) that working in tandem in twos was "not unusual for drug dealers that are surveilling a drug drop location." The court further found that Mr. Johns did not acquiesce to police authority but, rather, gave his consent to search his vehicle freely, intelligently, and voluntarily. Mr. Johns then entered into a plea agreement on the charges of possession of alprazolam, possession of drug paraphernalia, possession of a structure used for trafficking, sale or manufacture of controlled substances, and possession of a firearm by a felon, reserving the right to bring the appeal now before us.

## II.

Mr. Johns raises several issues challenging various aspects of his investigatory stop and search of his vehicle. Because we find merit in his arguments that there was no reasonable suspicion justifying his investigatory stop and that his

- 7 -

consent was invalidated by his illegal detention and a show of police authority, we do not address the remainder of his points.[6]

Our review of a circuit court's suppression order was summarized in Crawford v. State, 980 So. 2d 521, 523 (Fla. 2d DCA 2007):

> Appellate review of a motion to suppress is a mixed question of law and fact. Bautista v. State, 902 So. 2d 312, 314 (Fla. 2d DCA 2005). Deference is given to the trial court's factual findings if they are supported by competent and substantial evidence. Id. (citing Cillo v. State, 849 So. 2d 353, 354 (Fla. 2d DCA 2003)). However, this court has an "independent obligation to review the ultimate question of probable cause and reasonable suspicion" under a de novo standard to make certain law enforcement practices remain within constitutional parameters. Connor v. State, 803 So. 2d 598, 606 (Fla. 2001).

With respect to the issue of Mr. Johns' purported consent to search his car, we have held that "[c]onsent given after an unlawful detention, or other illegal police conduct is closely scrutinized because such conduct 'presumptively taints and renders involuntary any consent subsequently obtained.' " DeLeon v. State, 700 So. 2d 718, 720 (Fla. 2d DCA 1997) (quoting Alvarez v. State, 515 So. 2d 286, 288 (Fla. 4th DCA 1987)).

The first issue, the sufficiency of Mr. Johns' investigatory stop, can be decided fairly easily. A law enforcement officer may detain an individual "under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county." § 901.151(2), Fla. Stat. (2012); see also Terry v. Ohio, 392 U.S. 1, 38 (1968). There is no question that Mr. Johns was

---

[6]Our opinion, moreover, is confined solely to these issues as they pertain to Mr. Johns, not any of his codefendants.

detained for investigation by the detectives. Unfortunately, there was no reasonable suspicion to support his detention.

The only connections the circuit court could draw between the package of marijuana that precipitated this investigation and Mr. Johns at the time he was detained were his arrival at a duplex where marijuana was to be delivered and the prior actions of a person Mr. Johns accompanied. But it is well settled that one's mere presence in a place of potential criminal activity does not, by itself, furnish reasonable suspicion to justify an investigatory stop. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." (citing Brown v. Texas, 443 U.S. 47 (1979))); Julian v. State, 528 So. 2d 427, 429 (Fla. 2d DCA 1988) (holding that defendant's presence on premises subject to search warrant was insufficient to establish suspicion of defendant's participation in criminal activity); see also Batson v. State, 847 So. 2d 1149, 1151 (Fla. 4th DCA 2003) ("The vehicle's mere presence near the scene is insufficient to give rise to a reasonable suspicion that its occupants were connected to the recent burglary." (first citing H.H. v. State, 775 So. 2d 397 (Fla. 4th DCA 2000); then citing Moore v. State, 584 So. 2d 1122 (Fla. 4th DCA 1991))).

And to the extent Mr. Mason's actions could be said to have generated a reasonable suspicion of criminal activity (an issue we do not reach here), Mr. Mason's appearance and activities that morning would not supply a reasonable suspicion that Mr. Johns was connected with those activities, absent some evidence of an actual connection. See Brown v. State, 224 So. 3d 806, 809 (Fla. 2d DCA 2017) (holding that

for reasonable suspicion to exist, "the detaining officer [ ] must have a particularized and objective basis for suspecting the particular person stopped of criminal activity" (alteration in original) (quoting B.G. v. State, 213 So. 3d 1016, 1018 (Fla. 2d DCA 2017))). We held in B.G. that an officer who witnessed a cloud of marijuana smoke emanating from a group of four juveniles (all of whom "smelled equally" of marijuana, id. at 1017) did not have a reasonable suspicion to detain an individual in that group since the officer could not see which of the four were smoking the marijuana, id. at 1018-19. See also Calhoun v. State, 627 So. 2d 60 (Fla. 2d DCA 1993) ("A visitor's mere presence on the premises authorized to be searched is insufficient evidence of criminal conduct to justify a search of his person." (citing Ybarra v. Illinois, 444 U.S. 85 (1979))). The detectives who initiated the Terry stop of Mr. Johns had even less reason to suspect Mr. Johns of a personal involvement with this package of marijuana than the police officer had to suspect B.G.'s involvement with a marijuana cigarette. B.G., 213 So. 3d at 1018-19. Indeed, on this point, Detective Ripke candidly conceded that the only suspicion he had that pertained to Mr. Johns individually was one of "wonder why you're here." That is practically synonymous with "a mere hunch" that Mr. Johns had some part to play with the interdicted package of marijuana. See Reza v. State, 163 So. 3d 572, 577 (Fla. 3d DCA 2015) ("In order not to violate a citizen's Fourth Amendment rights, an investigatory stop requires a well-founded, articulable suspicion of criminal activity. A mere hunch is not enough to support a stop." (first citing Popple v. State, 626 So. 2d 185, 186 (Fla. 1993); then citing State v. Taylor, 826 So. 2d 399, 405 (Fla. 3d DCA 2002); and then citing Carter v. State, 454 So. 2d 739 (Fla. 2d DCA

1984))).  Because there was no reasonable, particularized suspicion of Mr. Johns at the point in time he was detained, the detectives' investigatory stop of him was unlawful.

Having determined he was illegally stopped, we readily agree with Mr. Johns that the consent he gave to search his vehicle was invalidated by his unlawful detention.  We have previously explained:

> If a person has been illegally seized by police and subsequently consents to a search, "the State bears the burden of showing by clear and convincing proof that there was an unequivocal break in the chain of illegality sufficient to dissipate the taint of the law enforcement's prior illegal activity."

Villanueva v. State, 189 So. 3d 982, 985 (Fla. 2d DCA 2016) (quoting Kutzorik v. State, 891 So. 2d 645, 648-49 (Fla. 2d DCA 2005)).  The State has not articulated, and the record does not reveal, *any* break in the "chain of illegality" of Mr. Johns' detention— which, here, includes not only the initial detention, but a subsequent show of police authority in calling a K9 unit to search Mr. Johns' car, commands to Mr. Johns to surrender his identification and car keys, and a warning that he was not free to leave the duplex.  Cf. State v. Hall, 201 So. 3d 66, 68 (Fla. 3d DCA 2015) (affirming trial court's finding that consent was not freely given during investigatory stop where "[d]espite the fact that, in this instance, the police were polite and did not draw their weapons, there was nevertheless the appearance of police authority and the circumstances were coercive in nature: the police arrived in three to four vehicles, blocked the driveway, frisked both parties, took their ID and car keys, and searched the vehicle three times before finding the small taser"); Cooper v. State, 654 So. 2d 229, 231 (Fla. 1st DCA 1995) (finding that "[t]he request to search the vehicle, after any reasonable suspicion of wrongdoing had been dispelled, coupled with the threat to prevent appellant's departure

- 11 -

until dogs could be brought to the scene, amounted to an illegal detention"). Considering the totality of the circumstances before us, we can only conclude that whatever consent Mr. Johns gave was involuntary.

Accordingly, we reverse the circuit court's denial of the motion to suppress as it pertains to Mr. Johns, as well as the judgments and sentences that were entered based upon his plea agreement.

Reversed.


NORTHCUTT and MORRIS, JJ., Concur.