WARNER, J.
 

 Jason Tengbergen appeals his conviction for DUI manslaughter. He makes three claims, none of which require reversal. First, he argues that the trial court erred in denying suppression of his post-Mi
 
 randa
 
 statements, as they were obtained in a two-step “question-first” custodial interrogation in violation of
 
 Missouri v. Seibert,
 
 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). We affirm the trial court, as we conclude that the statements were admissible under
 
 Oregon v. Elstad,
 
 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Second, he claims that the court erred in admitting a police officer’s opinion on accident reconstruction without qualifying the officer as an expert. We disagree, as the court heard the evidence of the officer’s qualifications and overruled the defense objection to his testimony on that ground. Third, he claims the court erred in failing to conduct a Richardson
 
 [1]
 
 hearing with respect to the expert testimony. However, the issue was addressed pre-trial, and his trial objection was waived by his failure to object when the expert evidence was introduced. We therefore affirm.
 

 Around 10:00 p.m. on August 6, 2005, Lieutenant Scott Breton, an off-duty Palm Beach County sheriff, was driving his marked sheriffs vehicle in the left-hand lane northbound on Congress Avenue when he observed a vehicle speed past him about twenty miles over the speed limit. Breton sped up to catch the passing vehicle and saw it swerve to the right, hit the right-hand curb, and then jerk back into the lane of travel. The vehicle hit an object, but Breton could not tell what it was. As he passed the spot where the vehicle hit the object, he saw people and heard a woman screaming. Fearing that the vehicle had hit a person, Breton followed the vehicle which proceeded into a shopping center and then came to stop in a nearby neighborhood.
 

 The driver, who was appellant Tengber-gen, exited the vehicle yelling, “What did I do? What did I do?” Another individual approached him and yelled at Tengbergen that he had just hit somebody. Tengber-gen responded, “Well, he shouldn’t have been in the f — ing road.” Breton placed Tengbergen in handcuffs and secured him inside the police vehicle. As Breton led him to the police vehicle, Tengbergen asked if he was under arrest and what was going to happen. Breton tried to keep him calm and told him that they would sort this all out.
 

 The other individual who yelled at Teng-bergen was a witness to the accident. Mr.
 
 *732
 
 Rivas and his brother had turned northbound onto Congress in their vehicle when they encountered Tengbergen’s vehicle which moved from the center lane into the right-hand lane, almost side-swiping the brothers’ car. Tengbergen swerved and returned to the center lane where he almost hit a pickup truck. Tengbergen continued to drift between lanes, hitting the reflectors. Rivas called 911 because the vehicle was speeding and almost hit him and another vehicle. While he was on the phone with 911, the vehicle ran a red light. Rivas saw something crossing the road and then both brothers saw something flying through the air. When Rivas got closer, he realized that the vehicle had struck a person. Rivas pursued Tengbergen’s vehicle and came upon it at the same time that Breton did. He jumped out and confronted Tengbergen. Breton took charge of Tengbergen and told Rivas to return to the victim.
 

 Breton brought Tengbergen back to the scene of the accident. Officers were arriving at the scene, and Officer Pete Picciano of the Boynton Beach Police Department approached Tengbergen in Breton’s vehicle. Picciano asked Tengbergen what happened. At his deposition, Picciano related that Tengbergen told him that “he was driving along and thought nothing of it when he hit [the victim]. He didn’t see the police car in back of him trying to stop him after the fact.” Picciano observed that Tengbergen’s eyes were red and glassy, and he spoke with slurred speech. However, Picciano did not question him about drinking.
 

 Officer Richard McNevin, the traffic homicide investigator for the Boynton Beach Police Department, arrived approximately a half an hour later. By that time the victim had died, and McNevin knew a homicide had occurred. He spoke with Picciano and then went over to Tengber-gen who was still in handcuffs in the police vehicle. McNevin introduced himself as the lead investigator on the accident. He did not indicate that he was conducting a criminal investigation. McNevin asked Tengbergen what happened, and Tengber-gen told him that “a person appeared out of nowhere and he struck him.” McNevin asked other basic information, such as what direction Tengbergen was travel-ling — information necessary for the accident report. The conversation was brief.
 

 After conducting further investigation of the scene and talking to other witnesses, McNevin sought a blood sample from Tengbergen, which he obtained at 12:10 a.m. Both Picciano and McNevin testified in their depositions that McNevin read Tengbergen
 
 Miranda
 
 rights prior to blood being drawn, although McNevin was less sure about this point than Picciano. An hour later McNevin took his statement, which was recorded. McNevin read Teng-bergen his rights, and Tengbergen acknowledged each one. In his statement, Tengbergen admitted to having consumed alcohol and recited the details of his evening, including hitting the victim.
 

 Tengbergen was eventually arrested and charged with DUI manslaughter and failure to render aid. He moved to suppress all of his statements. The state and defense agreed to suppress all statements made to Picciano and those made to McNevin prior his administering
 
 Miranda
 
 warnings. The court denied the motion as to statements made to McNevin after the warnings.
 

 At trial, McNevin testified regarding his investigation and also as to his reconstruction of the accident. He did not observe any skid marks, which would indicate that the vehicle did not take any evasive action to avoid hitting the victim. He explained the body damage to the right side of the vehicle. When the state asked McNevin if
 
 *733
 
 he had an opinion as to what occurred when the vehicle hit the victim, defense counsel objected that McNevin had not been qualified as an accident reconstruction expert. The state elicited his training and education provided by the police department in the field of accident reconstruction. Over objection, the court permitted McNevin to offer an opinion as to what happened immediately after Teng-bergen struck the victim. McNevin opined that “[ajfter the vehicle struck the pedestrian, the pedestrian’s body rolled up on to the windshield. After impacting the windshield, and crushing in the windshield, it rolled off of the passenger side of the car and that is where the passenger’s side mirror was ripped off’ and that the impact “would ... have been in view of the driver of the vehicle at that moment.” The actual impact occurred in the bicycle lane.
 

 Toxicologist Dustin Yateman testified that at 12:12 a.m. when the blood samples were taken, Tengbergen’s blood alcohol level was .227 and .228, which is more than double the legal limit. Using retrograde extrapolation, he calculated that Tengber-gen’s blood alcohol level at the time of the incident at 10:19 p.m. was .247 to .267. In arriving at this figure, Yateman considered Tengbergen’s food consumption during the day. Yateman also considered that Teng-bergen ingested his last drink approximately twenty minutes before the incident.
 

 Although Tengbergen did not present any case in defense, he argued to the jury that the toxicologist’s sampling was incorrect and that he was not impaired at the time of the accident. The jury found him guilty of DUI manslaughter, a lesser included offense of the charge. The court sentenced him to fifteen years in prison, with credit for time served. Tengbergen appeals.
 

 I. Denial of Suppression of Post-Mi
 
 randa
 
 Statement
 

 On appeal, Tengbergen argues that the trial court erred in denying the post-Mi
 
 randa
 
 portion of his statement to McNev-in, as he claims it was obtained through a two-step question-first interrogation contrary to
 
 Missouri v. Seibert,
 
 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The trial court denied the motion to suppress his
 
 post-Miranda
 
 statement. We affirm, concluding that the statement was uncoerced, and his first statement did not taint the second statement.
 

 “A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.”
 
 Hunter v. State,
 
 8 So.3d 1052 (Fla. Sept. 2008) (quoting
 
 Schoemuet-ter v. State,
 
 931 So.2d 857, 866 (Fla.2006)). An appellate court accords a presumption of correctness to the trial court’s ruling on motion to suppress with regard to the trial court’s determination of historical facts, but independently reviews mixed questions of law and fact.
 
 Id. See also Lindo v. State,
 
 983 So.2d 672, 675 (Fla. 4th DCA 2008).
 

 In
 
 Oregon v. Elstad,
 
 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court considered whether the initial failure of law enforcement officers to administer
 
 Miranda
 
 warnings taints subsequent admissions made after a suspect has been fully advised of and has waived his
 
 Miranda
 
 warnings. An officer went to Elstad’s home with a warrant for his arrest. In the presence of the suspect’s mother, the officer explained that he had a warrant for his arrest for the burglary of a neighbor’s residence. Elstad told the officer that he
 
 *734
 
 was there. At the station house one hour later, Elstad gave a full statement after receiving and waiving his
 
 Miranda
 
 rights. The United States Supreme Court held the second statement was admissible and voluntary.
 

 The Court reasoned:
 

 [A] simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect’s ability to exercise his free will [does not] so taint[ ] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though
 
 Miranda
 
 requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.
 

 Id.
 
 at 309, 105 S.Ct. 1285. “[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite
 
 Miranda
 
 warnings.”
 
 Id.
 
 at 318, 105 S.Ct. 1285.
 

 The Court addressed a similar issue in
 
 Missouri v. Seibert,
 
 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), where it considered the admissibility of statements obtained pursuant to an official policy of questioning suspects without first giving
 
 Miranda
 
 warnings and then obtaining a second statement after administering warnings. Seibert was arrested and then questioned without
 
 Miranda
 
 warnings for thirty or forty minutes until she confessed. After a twenty-minute break, the interrogating officer turned on a tape recorder, gave Seibert
 
 Miranda
 
 warnings, and resumed questioning while confronting her with her pre-warning statements. Seibert again gave a confession. During the suppression hearing, the interrogating officer testified that he made a “conscious decision” to withhold
 
 Miranda
 
 warnings pursuant to an interrogation technique he had been taught to question first, then administer warnings, and repeat the question until he obtained the answer the suspect had already provided.
 
 Id.
 
 at 605-06, 124 S.Ct. 2601.
 

 The Court upheld the suppression of the confession. In a four-justice plurality opinion, Justice Souter stated:
 

 The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function “effectively”
 
 as' Miranda
 
 requires.... [U]nless the warnings could place a suspect who has just been 'interrogated in a position to make such an informed choice, there is no practical justification for áccepting the formal warnings as compliance with
 
 Miranda, or
 
 for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.
 

 Id.
 
 at 611-12, 124 S.Ct. 2601. The plurality framed the issue as “whether
 
 Miranda
 
 warnings delivered midstream could be effective enough to accomplish their objective].”
 
 Id.
 
 at 615, 124 S.Ct. 2601. In making this determination, the following relevant factors should be considered:
 

 the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.
 

 Id.
 

 Applying these factors, the plurality distinguished
 
 Elstad,
 
 reasoning that a reasonable person in Elstad’s position could per
 
 *735
 
 ceive the station house questioning as a new and distinct experience, and the
 
 Miranda
 
 warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission. However, the circumstances of Seibert’s statement were “the opposite extreme” and encompassed a police strategy adopted to undermine
 
 Miranda
 
 warnings.
 
 Id.
 
 at 616, 124 S.Ct. 2601. Reviewing the facts in
 
 Seibert
 
 he plurality concluded that the post-warning statements were inadmissible.
 

 In his concurring opinion, Justice Kennedy agreed that the question-first technique was designed to circumvent
 
 Miranda
 
 and obscured its meaning. However, he thought that the majority test was too broad. Instead, he proposed “a narrower test applicable only in the infrequent case ... in which the two-step interrogation technique was used in a calculated way to undermine the
 
 Miranda
 
 warning.”
 
 Id.
 
 at 622, 124 S.Ct. 2601. Where the two-step interrogation was not deliberately employed as a tactic, the analysis should still be governed by
 
 Elstad.
 

 Florida courts have heretofore applied Justice Kennedy’s rule, as it represents the narrower view. “When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the ‘holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.’ ”
 
 Marks v. United States,
 
 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (citation omitted). Justice Kennedy’s opinion provides the narrowest grounds.
 
 See Jump v. State,
 
 983 So.2d 726, 728-29 (Fla. 1st DCA 2008);
 
 State v. Lebron,
 
 979 So.2d 1093, 1095 (Fla. 3d DCA 2008);
 
 State v. Pitts,
 
 936 So.2d 1111, 1136 (Fla. 2d DCA 2006). Accordingly, unless the officers deliberately withheld warnings,
 
 Elstad
 
 controls Tengbergen’s
 
 Miranda
 
 claim.
 

 In this case there is no evidence that the officers employed a deliberate two-step question-first, warn-later policy. In fact, because a traffic accident occurred, the officers were required to investigate, and Tengbergen was required to provide information.
 
 See
 
 §§ 316.065(1); 316.066, Fla. Stat. The
 
 pre-Miranda
 
 statements given to both Picciano and McNevin provided only basic information regarding the accident that the officers already knew from other witnesses, such as direction of travel. The officers did not ask about his drinking or even much detail about how the accident happened. The fact that he was questioned while handcuffed in the backseat of a police vehicle without
 
 Miranda
 
 warnings does not in and of itself show a deliberate and calculated method to undermine the safeguards guaranteed in
 
 Miranda.
 

 The
 
 un-Mirandized
 
 questioning by Pic-ciano and then McNevin occurred close to the time of the accident. Over an hour went by before the officers obtained a blood sample from Tengbergen. Another hour passed before McNevin recorded Tengbergen’s statement on tape, including reading
 
 Miranda
 
 rights. Although Teng-bergen maintains that the officer attempted to minimize the rights by telling Teng-bergen he was going to read them “real quick,” the transcript of the taped statement shows that each right was read, and Tengbergen acknowledged each of them.
 

 Even if Justice Souter’s plurality opinion in
 
 Seibert
 
 were to apply, we would still come to the conclusion that the statements were properly admitted. The first statements appear to be extremely brief and contained no detailed information— merely that required to prepare an accident report. The second statement, taken
 
 *736
 
 hours later, did not refer to the prior statement, and McNevin did not use the original statement to induce the subsequent one. A reasonable person would have perceived the questioning by McNev-in to be separate and distinct from the earlier questioning.
 

 We conclude that the trial court’s denial of the motion to suppress the post-Mi
 
 •randa
 
 statement is amply supported by the facts and the law.
 

 II. Qualification of Expert Witness
 

 In permitting Officer McNevin to testify as an accident reconstruction expert, the trial court overruled defense counsel’s objection to his testifying in the form of an opinion without being qualified. Although the trial court did not state that it determined the officer was an expert, the court overruled the defense objection on that ground. We conclude that the court sufficiently determined the criteria for the admission of his testimony.
 

 The standard of review for admissibility of evidence is abuse of discretion, limited by the rules of evidence.
 
 Nardone v. State,
 
 798 So.2d 870, 874 (Fla. 4th DCA 2001). The standard of review for trial court decisions concerning the qualifications of expert witnesses and the scope of their testimony is abuse of discretion.
 
 Terry v. State,
 
 668 So.2d 954, 960 (Fla.1996);
 
 Gold, Vann & White, P.A. v. DeBerry,
 
 639 So.2d 47, 55 (Fla. 4th DCA 1994).
 

 As the supreme court has explained: Section 90.702 requires that before an expert may testify in the form of an opinion, two preliminary factual determinations must be made by the court under section 90.105. First, the court must determine whether the subject matter is proper for expert testimony, i.e., that it will assist the trier of fact in understanding the evidence or in determining a fact in issue. Second, the court must determine whether the witness is adequately qualified to express an opinion on the matter.
 

 Terry,
 
 668 So.2d at 960. In this case, the trial court, cognizant of that standard, overruled the defense objection and permitted McNevin to offer expert opinion testimony.
 

 After McNevin had testified for quite a while as to his investigation and his opinions as to skid marks or their absence, the point of impact, and other issues, the defense objected when the state asked McNevin his opinion “as to what occurred as the vehicle hit the person, and how the sequence of the crash occurred.” Defense counsel maintained that he had not been rendered an expert witness. The court noted that McNevin had been testifying for twenty minutes on subjects which would be subject to the same objection. The court then recited the three factors which must be present in order to admit expert testimony: (1) whether the witness will be relating information which would aid the jury; (2) whether the subject area is one for expert testimony; and (3) whether the witness has sufficient qualifications to establish the “merit” of his opinion. The court sustained the defense objection, and the state proffered McNevin’s qualifications. Defense counsel cross-examined his qualifications and then objected to McNevin testifying to his opinion.
 

 The court overruled the defense objection and told the jury that expert witnesses are like other witnesses, except they can give their opinion. The court further instructed the jury:
 

 [T]he law requires that you make the decision, number one whether the person is really an expert. That’s the ultimate decision. Two, that he has knowledge about the subject matter what, as
 
 *737
 
 to what he testifies to. And three, whether or not the opinion that is proffered is, indeed, something that you find to be reliable. I am making no declaration. The question is: Is there an objection to permitting the witness to answer the question. There is an objection, it is overruled. You may proceed. It is the jury’s decision.
 

 The judge’s instruction to the jury paraphrased Florida Standard Jury Instruction (Criminal) 3.9(A).
 

 While Tengbergen contends that the court erred by not “qualifying” McNevin as an expert, the trial court determined that the requirements for the introduction of expert testimony were met when it overruled the defense objection that McNevin was not qualified as an expert. Although the court did not explicitly state to the jury that it found the witness qualified as an expert, the court reasonably followed the suggestion of this court that a court should refrain from telling the jury that the witness’s testimony is being admitted as “expert testimony,” because that may be tantamount to the court commenting on the credibility of a witness.
 
 See Alexander v. State,
 
 931 So.2d 946, 951 (Fla. 4th DCA 2006) (“the better procedure would have been to permit the witness to testify without reference to his or her status as an expert”).
 
 See also Chambliss v. White Motor Corp.,
 
 481 So.2d 6, 8 (Fla. 1st DCA 1985) (“[I]t is not necessary for the court to state that the witness is qualified as an expert. In fact, it is questionable whether it is proper procedure for a court to expressly declare a witness an ‘expert’ because the jury may infer from such declaration that the court is placing its approval on the opinions of the witness.”). The court appropriately ruled, and it committed no error.
 

 III. Absence of
 
 Richardson
 
 Hearing
 

 A week prior to trial the court held a pretrial conference at which time defense counsel raised a
 
 Richardson
 
 issue, because the state was intending to use Officer McNevin as an accident reconstruction expert. Although the defense had taken his deposition in connection with the traffic homicide investigation and calculations he made from the data, he was not asked whether he had expert opinions on accident reconstruction. The court told the state to make the officer available to the defense if the state intended to use him as an expert. The prosecutor told the court and defense counsel that he would be calling McNevin as an expert and told defense counsel that he could arrange a time for counsel to interview McNevin. The defense apparently did not talk to McNevin prior to trial.
 

 After McNevin testified to his various opinions on accident reconstruction, the state sought to introduce a photograph with markings on it to depict the witness’s opinions. At that point defense counsel moved for a
 
 Richardson
 
 hearing, stating that “he still has not been proffered as an expert.” The court then asked defense counsel whether he had seen the photograph before, and counsel admitted that he had seen it in the prosecutor’s office. Upon further questioning from the court, defense counsel stated the problem was “all the markings and the way it has been done.”
 

 Later, defense counsel again complained about the entire testimony of McNevin’s accident reconstruction, claiming that he was unaware that the officer would testify as an expert. However, the court reminded counsel of the pretrial conference and the state’s representations. The court also noted McNevin had already testified to his opinions without defense counsel raising a
 
 Richardson
 
 violation. Only the photo
 
 *738
 
 graph had not been admitted at the time of the objection, and thereafter the court denied its admission.
 

 This
 
 Richardson
 
 issue is not preserved. First, the potential discovery violation was brought to the attention of the court a week before trial and the court required that the state provide the witness to the defense, yet the defense did not take the witness’s deposition on his expert opinions. With a week to go until trial, and the opportunity to cure any prejudice, we do not think that a
 
 Richardson
 
 violation has occurred. Second, while the defense objected to McNevin’s qualifications to give expert opinions, counsel did not raise his objection to a
 
 Richardson
 
 violation until the officer had already testified to his expert opinions. Where the defense knew about the potential testimony in advance of the trial, an objection based upon
 
 Richardson
 
 is waived when the defense does not object on those grounds prior to the witness testifying.
 
 See Taylor v. State,
 
 589 So.2d 918 (Fla. 4th DCA 1991).
 

 Finding no errors, we affirm the conviction and sentence.
 

 POLEN and HAZOURI, JJ., concur.
 

 [1]
 

 .
 
 Richardson v. State,
 
 246 So.2d 771 (Fla.1971).