POLSTON, J.,
dissenting.
After holding an evidentiary hearing that produced more than 1,000 pages of transcript, the trial court found that the police officers in this case did not deliberately withhold Miranda warnings. This finding of fact is supported by competent substantial evidence in the record. Because of this finding of fact, the standard enunciated in Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), applies here. The majority’s holding is contrary to the well-settled Florida law that Elstad applies in these circumstances. See, e.g., Davis v. State, 990 So.2d 459, 466 (Fla.2008). Under the Elstad standard, Ross’s confession after the Miranda warnings is admissible. Accordingly, I respectfully dissent.[32]
I. The Officers Did Not Deliberately Withhold Miranda
As the Seventh Circuit Court of Appeals accurately explained, “[t]he question of whether the interrogating officer deliberately withheld Miranda warnings will invariably turn on the credibility of the officer’s testimony in light of the totality of the circumstances surrounding the interrogation. This is a factual finding entitled to deference on appeal....” United States v. Stewart, 586 F.3d 714, 719-20 (7th Cir.2008). Moreover, as this Court has explained, “[a]n appellate court reviewing a ruling on a motion to suppress presumes that a trial court’s findings of fact are correct and reverses those findings only if they are not supported by competent, substantial evidence.” Cuervo v. State, 967 So.2d 155, 160 (Fla.2007) (citing Connor v. State, 803 So.2d 598, 608 (Fla.2001)).
*437 Here, the trial court’s finding that the officers did not deliberately withhold Miranda warnings is supported by competent substantial evidence in the record. For example, Detective Waldron testified at the evidentiary hearing that he was trained by the Manatee County Sheriffs Office to read a suspect the Miranda warnings “[a]t a point in time where a person’s not going to be free, their movements are restricted and they’re not just free to get up and walk out.” And, when asked on cross-examination why he waited until the latter part of January 9 to read Ross his Miranda rights, Detective Wal-dron responded as follows:
Earlier on there still was insufficient evidence or enough in my mind probable cause to charge Blaine Ross. And he had requested to talk about what had been discussed on the news and the news media, so my intention was to answer his questions and to try to see if his statement wavered at all from what his previous statement was. And then if there was any indication or inconsistencies or anything incriminating, then at that point in time I felt there would be probable cause to arrest him, which would necessitate the reading of Miranda.
Additionally, the record reflects that Detective Waldron read Ross the Miranda warnings after learning that a bloody ski mask had been discovered in Ross’ car, evidence that Detective Waldron thought provided probable cause at the time. After a break and immediately before advising Ross of his Miranda rights, Detective Waldron reentered the interview room and stated to Ross, “There’s a couple of things that I discovered, and before we go any further I want to cover this with you....” Once Detective Waldron fully explained Ross’ rights, ensured that Ross understood his rights, and Ross waived those rights, Detective Waldron immediately proceeded to ask Ross about the ski mask that the police found in his car. Accordingly, there is competent substantial evidence in the record to support the trial court’s factual finding that the officers did not deliberately delay Miranda warnings and did not engage in a calculated strategy to secure an unwarned confession that could then be used to secure a warned confession.
Instead of deferring to this factual finding, the majority extensively reweighs the evidence and reevaluates the credibility of Detective Waldron. For example, the majority recognizes that at the evidentiary hearing “Detective Waldron stated that he did not provide Miranda warnings earlier because he did not believe that he had probable cause to arrest Ross.” Majority op. at 430. However, despite this testimony that supports the trial court’s finding of fact, the majority concludes that “Detective Waldron clearly knew he had probable cause to arrest Ross at that time.” Id. The majority reaches its contrary finding, which evaluates the credibility of Detective Waldron’s testimony, by focusing upon a supposed conflict between Detective Wal-dron telling Ross during questioning that Ross was not under arrest and Detective Waldron’s evidentiary hearing testimony that that he did not believe he had probable cause until the discovery of the bloody ski mask in Ross’ car. Id. (“According to Detective Waldron, it was the discovery of the ski mask that allegedly provided this probable cause and prompted Detective Waldron to advise Ross as to his rights. Yet at this very point during the interrogation, when Ross asked if he was being arrested, Detective Waldron explicitly denied it....”). Of course, a police officer’s intent during questioning a suspect often conflicts with what the police officer actually tells the suspect. See, e.g., Davis v. State, 859 So.2d 465, 472 (Fla.2003) (finding a confession voluntary even though *438 defendant claimed officers stated that they were investigating a missing person’s case when the officers were actually investigating a murder). However, in this case, the conflict that the majority reaches is not even a conflict. A police officer can have probable cause to arrest a suspect, but not formally place the suspect under arrest.
Further, the majority gives great weight to testimony that it was the department’s policy to administer Miranda warnings once questioning took on an accusatory nature. See majority op. at 425. However, the majority apparently discounts other testimony regarding the policy that was before the trial court charged with making factual findings. Specifically, while both Detective Waldron and another officer testified that there was a “general order” that stated that Miranda warnings were to be provided once accusatory questioning occurred, both also testified that “general orders” are guidelines and not requirements. In fact, when specifically asked on cross-examination whether he had been trained to administer Miranda warnings once accusatory questioning took place, Detective Waldron stated that he was taught that it depends upon the particular circumstances. Detective Waldron also testified that the manner in which he questioned Ross did not violate department policy.
It was improper for the majority to discard the trial court’s factual finding regarding deliberateness and reevaluate the evidence for itself, particularly since this factual finding is heavily based upon a determination of Detective Waldron’s credibility. See Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976) (“[T]he function of the trial court is to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor and credibility of the witnesses appearing in the cause. It is not the function of the appellate court to substitute its judgment for that of the trial court through re-evaluation of the testimony and evidence.... ”). Whether this Court properly defers to the trial court’s deliberateness finding is important in this case because it determines whether this Court properly applies the standard from Elstad or erroneously applies the standard from Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).
II. Elstad Applies, Not Seibert
In Elstad, 470 U.S. at 310-11, 105 S.Ct. 1285, the United States Supreme Court held that the failure to provide Miranda warnings before an uncoerced confession does not necessarily render a second and warned statement inadmissible.[33] Rather, the admissibility of the second statement is governed by whether the subsequent waiver was voluntary and knowing. Elstad, 470 U.S. at 309, 105 S.Ct. 1285. If a defendant is fully informed of and voluntarily waives his Miranda rights, the statement after the Miranda warnings is admissible. See Davis v. State, 698 So.2d 1182, 1189 (Fla.1997) (“Shortly after confessing in his holding cell, Davis gave a taped statement in which he voluntarily gave the same information contained in his prior statement.... This [second] statement was clearly admissible because Davis was fully informed of (and waived) his Miranda rights before the start of the taping session.” (citing Elstad, 470 U.S. 298, 105 S.Ct. 1285)). Whether the second statement was voluntary requires a review *439 of the totality of the circumstances. See Ramirez v. State, 739 So.2d 568, 575-76 (Fla.1999) (applying Elstad).
The United States Supreme Court addressed this area of the law again in Seibert, 542 U.S. 600, 124 S.Ct. 2601. The United States Supreme Court held that a second confession was inadmissible when a police officer intentionally questioned a suspect without administering Miranda in order to elicit an unwarned confession that was then used to elicit a second warned confession. The plurality explained the following:
The threshold issue when interrogators question first and warn later is ... whether it would be reasonable to find that in these circumstances the warnings could function “effectively” as Miranda requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?
Seibert, 542 U.S. at 611-12, 124 S.Ct. 2601. The plurality then listed several factors to assist in determining whether the Miranda warnings were effective:
the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.
Id. at 615, 124 S.Ct. 2601. However, Justice Kennedy’s concurrence in Seibert is dispositive as he provided the necessary fifth vote and the narrowest grounds. See Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Justice Kennedy explained in his concurrence that he “would apply a narrower test applicable only in the infrequent case.” Seibert, 542 U.S. at 622, 124 S.Ct. 2601. Specifically, Justice Kennedy set forth the following test:
The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect’s situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example, a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Cf. Westover v. United States, decided with Miranda v. Arizona, 384 U.S. 436[, 86 S.Ct. 1602, 16 L.Ed.2d 694] (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

Id

The majority is improperly mixing the Elstad and Seibert standards together; rather, these are separate standards applicable in different circumstances. See, e.g., majority op. at 432 (“[A]s addressed in both Elstad and Seibert, courts review the circumstances surrounding both the warned and unwarned statements including ‘the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of *440 the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.’ ” (quoting Seibert, 542 U.S. at 615, 124 S.Ct. 2601 (plurality opinion) and citing Elstad, 470 U.S. at 310, 105 S.Ct. 1285)); majority op. at 424 (“The caselaw demonstrates that the analysis of the admissibility of statements made following a custodial interrogation and after the delayed administration of Miranda warnings is one of the totality of the circumstances, with the following being factors important in making this determination: (1) whether the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement; (2) whether the police minimized and downplayed the significance of the Miranda rights once they were given; and (3) the circumstances surrounding both the warned and unwarned statements including ‘the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of the police personnel, and the degree to which the interrogator’s questions treated the second round as continuous with the first.’ ” (footnotes omitted) (citing Elstad, 470 U.S. at 314, 105 S.Ct. 1285; Davis, 859 So.2d at 471 and quoting Seibert, 542 U.S. at 615, 124 S.Ct. 2601 (plurality opinion))).
It is important to recognize that the standard enunciated in Elstad and the standard enunciated in Seibert are different, coexisting standards. As Justice Kennedy’s opinion in Seibert explains, “[t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed.” Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment). Elstad solely requires an inquiry into whether the defendant voluntarily and knowingly waived his Miranda rights before the second confession. See Elstad, 470 U.S. at 309, 105 S.Ct. 1285 (“Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.”). In contrast, the Seibert standard presumes that the Miranda warnings before the second confession were ineffective. See Seibert, 542 U.S. at 617, 124 S.Ct. 2601 (“These circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect’s shoes would not have understood them to convey a message that she retained a choice about continuing to talk.”); Id. at 620, 124 S.Ct. 2601 (Kennedy, J., concurring) (“As Justice Souter points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made.”). Due to this presumption, the Seibert standard as enunciated in Justice Kennedy’s disposi-tive concurrence includes an inquiry into the additional “curative” factors listed above (such as the break in time and circumstances between the first and second statements), which are beyond the volun-tariness inquiry required by Elstad.
It is well-settled under Florida law that we apply Elstad as distinct from Seibert. This Court held in Davis v. State, 990 So.2d 459, 466 (Fla.2008) (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment)), that we apply Elstad unless officers used “the question-first method ‘in a calculated way to undermine the Miranda warning.’ ” *441 Specifically, in Davis, 990 So.2d at 464-66, this Court addressed the postconviction argument that the defendant’s confession was taken in violation of Seibert However, because the officers did not deliberately withhold Miranda in a calculated attempt to undermine the warnings, this Court held that Elstad applied to the defendant’s confession, not Seibert. Davis, 990 So.2d at 466; see also Tengbergen v. State, 9 So.3d 729, 735 (Fla. 4th DCA 2009) (“[U]n-less the officers deliberately withheld warnings, Elstad controls Tengbergen’s Miranda claim.”); Jump v. State, 983 So.2d 726, 729 (Fla. 1st DCA 2008) (“[T]hese principles of Elstad continue to control ‘unless the deliberate two-step strategy was employed.’ ” (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))); State v. Lebron, 979 So.2d 1093, 1096-97 (Fla. 3d DCA 2008) (“Justice Kennedy went on to say, ‘The admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed.’ That portion of Justice Kennedy’s concurrence is decisive here, for there was no deliberate use of the two-step strategy under the circumstances of the present case.” (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring in the judgment))); State v. Pitts, 936 So.2d 1111, 1136 (Fla. 2d DCA 2006) (“When we consider the interrogation of Pitts under the test articulated in Seibert by Justice Kennedy, we can readily conclude that Pitts’ post-Miranda statements should not be suppressed. The record before us does not show that ‘the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.’ ” (quoting Seibert, 542 U.S. at 622, 124 S.Ct. 2601

. I agree with the majority that the statements made by Ross on January 9, once he was confronted with the evidence of blood on his pants, but before the Miranda warnings were given, are inadmissible. However, that error was harmless. Before the Miranda warnings on January 9, Ross did not confess. Rather, Ross merely admitted that, because he could not remember, it was possible that he killed his parents, but that he did not believe that he had done so. There is not a reasonable possibility that these equivocal statements affected the verdict given the admissible evidence in this case, including his parents' blood on his pants and his confession after the Miranda warnings.

. In this case, on January 9, Ross went to the police station on his own and voluntarily met with Detective Waldron. In fact, prior to this meeting, Ross had left several phone messages for Detective Waldron indicating his desire to discuss the case with the detective. Therefore, Ross’ statements on January 9 pri- or to the Miranda warnings were uncoerced.